# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION
## AT GREENEVILLE

|  |  |  |
|---|---|---|
| STEVEN J. LAWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| COCKE COUNTY, Tennessee, | ) | Jury of Twelve Demanded |
| a governmental entity; | ) | |
| ARMANDO FONTES, Sheriff of Cocke | ) | |
| County, Tennessee, individually; | ) | |
| JOSHUA R. HARTSELL, individually; | ) | |
| COLTON S. ROLLINS, individually; | ) | |
| ASHLEY NORTON, individually; | ) | |
| JERRY BALL, individually; | ) | |
| AARON RAINES, individually; | ) | |
| MACY N. STUMP, individually; | ) | |
| RONALD RUTKIEWICZ, individually; | ) | |
| BRYAN A. WILLS, individually; | ) | |
| QCHC, Inc., a/k/a Quality Correctional Healthcare; | ) | |
| SHERRY LAWSON, individually; | ) | |
| SAMANTHA CARTWRIGHT, individually; and | ) | |
| JOHN and JANE DOES 1-10, individually, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT FIOR CIVIL RIGHTS VIOLATIONS AND DAMAGES

---

Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: 865-200-4117
lance@lbakerlawfirm.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I.      NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    Snapshot of the Cocke County Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    Steven J. Laws Is Booked Into the Jail Annex . . . . . . . . . . . . . . . . . . . . . . 13

        C.    Failures to Classify and Segregate Violent From Non-Violent Inmates . . . . . . . 13

        D.    Plaintiff Is Brutally Assaulted By Inmates, As Corrections Officers Are
              Absent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        E.    Plaintiff Is Hospitalized for Severe Facial Trauma, Multiple Jaw Fractures,
              Surgical Repair of Those Fractures, and Other Injuries . . . . . . . . . . . . . . . . . 16

        F.    No Investigation Into Brutal Assault, No Criminal Charges for Plaintiff's
              Assailants, and No Reprimand for Corrections Officers . . . . . . . . . . . . . . . . . 17

        G.    Unsafe Jail Conditions: Antiquated Facilities, Overcrowding, Understaffing,
              and Unqualified Officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        H.    Failed Inspections and Decertification of the Jail. . . . . . . . . . . . . . . . . . . . . 24

        I.    Circumstances Require Discovery to Permit Plaintiff to More Precisely
              Allege His Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.      WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VI.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

              Count One – Failure to Protect Plaintiff (Against Sheriff Fontes and
              Chief Hartsell, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Count Two – Failure to Protect Plaintiff (Against Lt. Rollins, Lt. Stump, and Officers Norton, Ball, Raines, Rutkiewicz, and Wills, All Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Count Three – Policy, Custom, and Practice of Failing to Protect Inmates (Municipal Liability)(Against Cocke County) . . . . . . . . . . . . . . . . . . 35

Count Four – Failure to Train and Supervise Corrections Officers to Protect Inmates From Violence (Against Cocke County, Sheriff Fontes, and Chief Hartsell, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Count Five – Denial of Medical Care or Failure to Provide Adequate Medical Care (Against Lt. Rollins, Officer Wills, and Nurse Lawson, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Count Six – Policy, Custom, and Practice of Denying Medical Care or Providing Inadequate Medical Care to Inmates (Municipal Liability) (Against QCHC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Count Seven – Failure to Train and Supervise Facility Medical Staff (Against QCHC) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Count Eight – Negligence and Gross Negligence (Against Cocke County and Cocke County Individual Defendants, Individually) . . . . . . . . . . . 57

Count Nine – Intentional, Reckless, or Negligent Infliction of Emotional Distress (Against Lt. Rollins, Officer Wills, and Nurse Lawson, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

VII.    JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

VIII.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

-iii-

**COMES** Steven J. Laws ("Plaintiff") and files this Complaint against the Defendants: Cocke County, Tennessee ("the County"), Armando Fontes, former Sheriff of Cocke County, Tennessee, individually ("former Sheriff Fontes")[1]; Joshua R. Hartsell, Chief of Corrections, individually ("Chief Hartsell"); Colton S. Rollins, individually ("Lt. Rollins"); Ashley Norton, individually ("Officer Norton"); Jerry Ball, individually ("Officer Ball"); Aaron Raines, individually ("Officer Raines"); Macy N. Stump, individually ("Officer Stump"); Ronald Rutkiewicz, individually ("Officer Rutkiewicz"); Bryan A. Wills, individually ("Officer Wills") (collectively, "the Cocke County Defendants"); QCHC, Inc., a/k/a Quality Correctional Healthcare ("QCHC"); Sherry Lawson, individually ("Nurse Lawson"); Samantha Cartwright, individually ("Nurse Cartwright") (collectively, "the QCHC Defendants"); and John and Jane Does 1-10, individually ("the Doe Defendants") (collectively, "Defendants").

## I. NATURE OF ACTION

### *"[I]t is unsafe for inmates*. . . ."[2]

1.      This is a civil rights class action brought by Steven J. Laws ("Plaintiff") against the Cocke County and QCHC Defendants for violations of his civil rights under the United States Constitution and Tennessee common and statutory law. Plaintiff, jailed on misdemeanor drug charges in the Cocke County Jail ("the Jail") was savagely and repeatedly beaten by several other inmates over the course of an hour, losing consciousness from the blows to his head. He was beaten and stomped in his cell, dragged into the showers and beaten and kicked again, and dragged back to his cell and beaten and stomped yet again. He sustained serious head and facial trauma, including

---

[1]CJ Ball was elected sheriff on August 4th, 2022 and took office on September 1, 2022.

[2]Former Cocke County Mayor Ottinger, speaking on September 7, 2017, about why the Tennessee Corrections Institute's review committee indicated that the Jail was not re-certified.

a concussion, multiple jaw fractures that required emergency surgery, lacerations, bruises, swelling, and injuries to his neck, back, and hip.

2. All the while, for approximately twelve hours, although policy mandated regular security checks, no Corrections Officer was to be found, and Plaintiff stayed in his cell, unable to open his mouth or talk, bleeding from his head injuries, fearing for his life, and wondering why no one was helping him, until two officers happened by and saw his bloody clothes. Even then, as he begged for help and to go to the hospital, Corrections Officers and QCHC nurses paid little or no mind to his serious and obvious medical condition, merely recommending ice packs and over-the-counter pain medicine.

3. After two days of pain and agony, Plaintiff's mother bailed him out of Jail. He went to a local ER, then to a dentist, and ultimately to the University of Tennessee Medical Center ("UTMC") in Knoxville, where he had an emergency operation to surgically repair multiple jaw fractures and extract multiple impacted teeth.

4. This Complaint is centered upon the County's re-occurring system-wide failures to protect the safety and security of inmates incarcerated at the Cocke County Jail ("Jail")[3] and QCHC's failures to provide adequate medical care to inmates.

5. Based upon public statements of former Sheriff Fontes and other County officials, Tennessee Corrections Institute ("TCI")[4] inspections and reports, and upon information and belief,

---

[3] The Cocke County Jail consists of two separate facilities, the Old Jail and the Jail Annex. Plaintiff refers to both facilities collectively as "the Jail." When referring to only one of the facilities, Plaintiff will attempt to do so by referencing the specific name of that facility.

[4] Under the authority of Tenn. Code Ann. § 41-4-140, the TCI is required to establish minimum standards for adult local jails, lock-ups, workhouses and detention facilities in the state.

-1-

violence among inmates at the Jail is increasing at an alarming rate. Since 2012, thousands of inmates have been subjected to the unsafe Jail conditions, inmate-on-inmate violence, and suffered serious injuries. After years of increasing inmate violence, the County, former Sheriff Fontes, and Chief Hartsell took no meaningful action to alleviate or mitigate the root cause of the violence: unsafe Jail conditions, including severe overcrowding and under-staffing.

6.      Official state data shows that, for years, the Jail has been *the second most crowded jail in Tennessee*. It is understaffed, lacking sufficient manpower to supervise inmates. Historically, Jail officials have made no serious effort to separate violent offenders from non-violent ones. In this case, the deliberate indifference to inmate safety led to Plaintiff being viciously beaten.

7.      By March 19, 2022, when Plaintiff was booked, the County, former Sheriff Fontes, and Chief Hartsell knew that the Jail had been decertified by the TCI[5] in 2017 "after two years of failed inspections and warnings about lax employee training, staffing shortages, inadequate medical care and safety violations[.]"[6] It has never regained certification. Most of the glaring deficiencies relate to "gross overcrowding" and "under-staffing." Former Sheriff Fontes has long conceded that these conditions pose a "serious risk of safety, and a serious liability for the County."[7]

---

[5]The TCI's Board of Control establishes the standards to inspect and certify local correctional facilities.  Inspections and re-inspections are conducted within the mandated time-frame to ensure compliance of all standards for the purpose of certification.

[6]"*Cocke County Loses Jail Certification*," Knox News, Oct. 4, 2017, https://www.knoxnews.com/story/news/crime/2017/10/04/cocke-county-loses-jail-certificationga rners-lawsuit-over-32-year-old-inmates-death/725437001/ (last accessed March 19, 2023).

[7]"*Sheriff: Cocke Co. Jail is 'Inhumane,' Poses 'Serious Risk to Safety*," WBIR News, Feb. 12, 2020, available at https://www.wbir.com/article/news/local/ sheriff-cocke-co-jail-is-inhumane-poses-a-serious-risk-tosafety/ (last accessed March 19, 2023).

8.      When Plaintiff was booked, the Jail had exceeded its 120-person maximum capacity for no fewer than ***eleven consecutive years***, mostly hovering between *150% and 310% beyond capacity*.[8] Former Sheriff Fontes and other County officials admit that these conditions – particularly the chronic overcrowding – are responsible for the increasing number of inmate-on-inmate assaults. Yet, Fontes, Mayor Crystal Ottinger, Chief Hartsell, and other County officials took no meaningful action to address the unsafe conditions.[9] By the time Plaintiff was booked in March 19, 2022, conditions at the Jail had created an exceedingly high level of violence and County officials, acknowledging the dire conditions, were still taking no steps to address the danger. His fate was sealed when he was assigned to a cell housing several violent inmates.

9.      The assault – like assaults on hundreds of other inmates over the past twelve years – was the foreseeable result of longstanding policies or customs of deliberate indifference to inmate safety, *e.g.*, uncaring tolerance of chronic and gross overcrowding and understaffing, permitting a volatile environment of increased tension and inmate-on-inmate assaults, failing to promulgate sufficient safety protocols to provide adequate monitoring of inmates, and condoning the grossly inadequate training of Corrections Officers.

10.     Meanwhile, the policies, actions, or practices of QCHC, contracted to provide medical care to Jail inmates, all but guaranteed that Plaintiff would not receive proper care, if any

---

[8]In fact, summary report-data provided by the TCI indicates that since 2011, only one Tennessee county (Van Buren) has consistently had a larger overcapacity percentage of inmates in its jail than Cocke County. *See* historical TCI Jail Summary Reports https://www.tn.gov/correction/statistics-and-information/jail-summary-reports.html.

[9]*See "Overcrowding Breeds Ugly Fights Inside Cocke County Jail*," WVLT TV, Jan. 31, 2020, available at https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail567474631.html (last accessed March 19, 2023) (Sheriff Fontes: "This is not a new issue – it's been here along time.").

-3-

care at all. QCHC's nurses, Nurses Lawson and Cartwright, paid little or no attention to Plaintiff's obvious and serious medical needs, refusing to offer him any meaningful medical assistance, much less get the doctor's opinion, call EMS, or send him to a hospital. Seeing Plaintiff's battered head and face, knowing that he had been lost consciousness, and recognizing that he could neither open hios mouth or talk, they recommended ice packs and Tylenol. Their "opinions" and "treatment" were tantamount to no medical care at all.

11.    Plaintiff alleges the following claims:

■ Count One – Failure to Protect (Against Sheriff Fontes and Chief Hartsell, Individually);

■ Count Two – Failure to Protect (Against Lt. Rollins, Lt. Stump, and Officers Norton, Ball, Raines, Rutkiewicz, and Wills, All Individually);

■ Count Three – Policy, Custom, and Practice of Failing to Protect Inmates (Municipal Liability) (Against Cocke County);

■ Count Four – Failure to Train and Supervise Corrections Officers (Against Cocke County, Sheriff Fontes, and Chief Hartsell, Individually);

■ Count Five – Denial of Medical Care or Failure to Provide Adequate Medical Care (Against Lt. Rollins, Officer Wills, and Nurse Lawson, All Individually);

■ Count Six – Policy, Custom, and Practice of Denying Medical Care or Providing Inadequate Medical Care to Inmates (Municipal Liability) (Against QCHC);

■ Count Seven – Failure to Train and Supervise Facility Medical Staff (Against QCHC);

■ Count Eight – Negligence and Gross Negligence (Against County and All Individual Cocke County Defendants, Individually); and

-4-

■ Count Nine – Intentional, Reckless, or Negligent Infliction of Emotional Distress (Against Lt. Rollins, Officer Wills, and Nurse Lawson, All Individually).

12.    Plaintiff requests compensatory and punitive damages, as well as attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II.  JURISDICTION AND VENUE

13.    This action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth, Eighth, and/or Fourteenth Amendments of the United States Constitution, and for violations of Tennessee common law. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

14.    This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

15.    Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Cocke County, within the Northeastern Division of the Eastern District of Tennessee.

## III.  PARTIES

### A.    Plaintiff

16.    At all times material, Steven J. Laws ("Plaintiff") was a citizen and resident of Cocke County. Plaintiff was a pretrial detainee at the time of the incident at the Cocke County Jail, having been arrested and charged with misdemeanor drug offenses.

-5-

**B.    Defendants**

17.    Cocke County, Tennessee ("the County") is a governmental entity and political subdivision of the State of Tennessee, duly organized, which funds and maintains the Jail and employs the persons working there. The County, as a local government, is a public entity in accordance with 42 U.S.C. § 12131(1) and 42 U.S.C. § 12111(5). The County, upon information and belief, is also a recipient of federal financial assistance as required under 29 U.S.C. § 794.

18.    The County owns the Jail located in Newport, Tennessee. The County is responsible for, among other things, providing adequate funding for the operation of the Jail, including funding for training the Sheriff, the Sheriff's employees, and corrections officers, and funding to allow for adequate staffing and training of the Jail. It may be served through its chief executive officer, County Mayor Rob Mathis, at the Cocke County Courthouse, 360 East Main Street, Newport, TN 37821.

19.    The County possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment and removal of individual members of the Sheriff's Office, and to assure that said actions, policies, rules, regulations, practices and procedures of the Sheriff's Office and its employees and agents comply with the laws and constitutions of the United States and of the State of Tennessee.

20.    The County and the Sheriff's Office are answerable for the safekeeping of persons in their custody and responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

21.     At all times relevant to this Complaint, former Sheriff Armando Fontes ("Sheriff Fontes") was the duly-elected Sheriff of Cocke County, and was statutorily responsible for the screening, hiring, firing, training and the supervision of Sheriff's Office personnel; and responsible for the safety and welfare of those in his custody. Specifically, Sheriff Fontes was responsible for operating the Jail and Jail Annex and overseeing operations. That responsibility included, but was not limited to, supervising the Corrections Officers, who served at his will in their respective duties at the jail and providing adequate staffing at the Jail.

22.     Former Sheriff Fontes is the proper party to be sued under 42 U.S.C. §1983.  He is sued in his individual capacity and as principal on his official bond. Fontes was operating under color of law. He was a "policymaker" within the meaning of that term as applied by the Supreme Court in *Pembauer v. City of Cincinnati*, 479 U.S. 469 (1986), and as the official head of a "public entity" providing services, programs, or activities. Sheriff Fontes is, upon information and belief, a citizen and resident of Cocke County and may be served with process at his residence in Cocke County, Tennessee.

23.     At all times relevant to this Complaint, Defendant, Joshua R. Hartsell ("Chief Hartsell"), was employed by the CCSO as Chief of Corrections, a position to which he was appointed by former Sheriff Fontes. He acted with the authority invested in him by virtue of employment with the County, and is a state actor under § 1983. As a supervisor at the Jail, Chief Hartsell's responsibilities included, but were not limited to, providing sufficient training to Jail employees, including corrections officers, and creating and implementing adequate polices and procedures to ensure that inmates were safe. At all relevant times, he was jointly responsible with Sheriff Fontes for the management of the Jail.

-7-

24.     Chief Hartsell is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Hartsell is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

25.     At all times relevant to this Complaint, Defendant Colton S. Rollins ("Lt. Rollins"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Lt. Rollins is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

26.     At all times relevant to this Complaint, Defendant Ashley Norton ("Officer Norton"), was employed by the CCSO as a corrections officer. She is sued in her individual capacity and as principal on her official bond. She was operating under color of law. Officer Norton is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

27.     At all times relevant to this Complaint, Defendant Jerry Ball ("Officer Ball"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Officer Ball is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

28.     At all times relevant to this Complaint, Defendant Aaron Raines ("Officer Raines"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Officer Raines is, upon

-8-

information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

29. At all times relevant to this Complaint, Defendant Macy N. Stump ("Officer Stump"), was employed by the CCSO as a corrections officer. She is sued in her individual capacity and as principal on her official bond. She was operating under color of law. Officer Stump is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

30. At all times relevant to this Complaint, Defendant Ronald Rutkiewicz ("Officer Rutkiewicz"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Officer Rutkiewicz is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

31. At all times relevant to this Complaint, Defendant Bryan A. Wills ("Officer Wills"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Officer Wills is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

32. QCHC, Inc. a/k/a Quality Correctional Healthcare ("QCHC"), is a private for-profit jail medical provider incorporated under the laws of the State of Alabama with principal offices at 200 Narrows Pkwy., Ste. A, Birmingham, AL 35242-8624. As of March 19, 2022, QCHC was contracted by Cocke County to provide medical services to inmates housed at the Jail, undertaking what is traditionally a core municipal function, to wit, the provision of health care to inmates who

-9-

have no means of exiting their confinement to obtain their own.[10] QCHC may be served with process through Incorp Services, Inc., 216 Centerview Dr., Ste. 317, Brentwood, TN 37027-3226.

33.    QCHC is a "person" under 42 U.S.C. § 1983 and at all relevant times to this case acted under color of state law. QCHC was responsible for the establishment of policies, either formally or by custom for the provision of such services. QCHC was responsible for the employment, training, supervision and conduct of the Jail medical staff, including Nurses Lawson and Cartwright.

34.    As part of QCHC's business, it provides contract services to correctional facilities under contract with various governmental entities. At all times relevant to this action, QCHC conducted business within Cocke County. QCHC provided services within the Jail with the full authority of the government of the State of Tennessee, pursuant to Tenn. Code Ann. §41-24-101, et seq. and/or §41-8-101, et seq., and therefore acts under color of state law.

35.    QCHC is the entity charged to provide services at the Jail within the confines of the law and its contract with Cocke County and had a non-delegable duty to ensure that the conditions of confinement and health and safety of inmates incarcerated at the Jail, including the Plaintiff, were protected, in compliance with the Constitution and laws of the United States.

---

[10]Tenn. Code Ann. §§ 8-20-120 and 8-24-103, taken together, command the Tennessee Sheriffs and County Commissioners to provide priority funding for the county jails. If a Sheriff lacks the public funding for his or her "statutorily mandated duties," Tenn. Code Ann. § 8-24-103 authorizes a sheriff to seek a writ of mandamus to compel a county legislative body to fund those duties. One such duty, as specifically mandated by Tenn. Code Ann. § 41-4-115(a) is the provision of medical care to the prisoners.

-10-

36.     QCHC is responsible for the implementation of policies, procedures, practices and customs challenged herein required to be performed by law or contract. QCHC is also responsible for ensuring the Jail is in compliance with the Constitution and laws of the United States with respect to the matters entrusted to it by law and contract.

37.     To perform its services at the Jail, QCHC utilizes employees, agents or contractors, including Nurses Lawson, Cartwright, Dr. Donald Kern, and others, who perform services, including professional medical services, under color of state law and within the course and scope of their employment, agency, apparent authority or contract.

38.     QCHC is liable for its own conduct and the acts and omissions of its servants, employees, agents and contractors by virtue of the fact that they acted in conformity with the policies, practices and customs of QCHC and pursuant to the doctrines of agency, apparent agency, implied agency, employer/employee relations, joint and several liability, respondeat superior, vicarious liability, contract and as a result of QCHC's non-delegable duty to ensure the health and safety of the persons held in custody at the Jail.

39.     At all relevant times, Sherry Lawson, RN ("Nurse Lawson"), was servicing the Jail as a registered nurse ("RN") employed by QCHC. She is the RN Health Site Administrator for QCHC at the Jail. QCHC provided nursing services at the Jail at all relevant times. Nurse Lawson is sued in her individual capacity only. Nurse Lawson violated Plaintiff's civil and constitutional rights, as set forth herein. At all times material, and upon information and belief, Nurse Lawson was acting under color of state law and is subject to this action pursuant to 42 U.S.C. §1983. Nurse Lawson may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

-11-

40.     At all relevant times, Samantha Cartwright, LPN ("Nurse Cartwright"), was servicing the Jail as a licensed practical nurse ("LPN") and an employee of QCHC. Nurse Cartwright is sued in her individual capacity only. Nurse Cartwright violated Plaintiff's civil and constitutional rights, as set forth herein. At all times material, and upon information and belief, Nurse Cartwright was acting under color of state law and is subject to this action pursuant to 42 U.S.C. §1983. Nurse Cartwright may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

41.     Various persons or entities not made Defendants in this lawsuit, including but not limited to County officials, CCSO or QCHC officials or employees, have participated with Defendants in the violations asserted in this Complaint and have performed acts and made statements in furtherance thereof. These Doe Defendants, including an officer named " Yarbrough" or "Yarborough" and an officer named "Mihalek," have not yet been identified with such precision that they may be named as Defendants in this suit, but may be named by amendment when known.

## IV.   FACTUAL ALLEGATIONS

*"I just knew I was going to die in that jail"*[11]

### A.     Snapshot of the Cocke County Jail

42.     Cocke County currently operates two separate jails. The Old Jail, the facility housing female inmates, is located above the Courthouse. The Jail Annex, which houses male inmates, is located about 400 feet across Main Street.[12]

---

[11]Plaintiff, Steven J. Laws, discussing his state of mind before being released on bond.

[12]*See* "*Sheriff: Cocke Co. Jail Is 'Inhumane,' Poses a 'Serious Risk to Safety'*" https://www.13wmaz.com/article/news/local/sheriff-cocke-co-jail-is-inhumane-poses-a-serious-risk-to-safety/51-e59b4b4a-fc84-4314-9580-a0315c3a172f

-12-

43. According to TCI reports and former Sheriff Fontes, the Jail has enough room for about 142 inmates. On most days, however, the Jail houses over 200 inmates, many forced to sleep on the floor. Since July 2012, the average daily population has far exceeded its design capacity.

44. The Jail and Jail Annex have failed every TCI inspection since 2017. Data from the TCI indicates that, as of March 31, 2022, the month Plaintiff was booked, there were 151 inmates at the Jail, with beds for just 120, leaving 31 inmates to sleep on the floor.

**B.    Steven J. Laws Is Booked Into the Jail Annex**

45. On March 19, 2022, 34-year old Steven J. Laws ("Plaintiff") was arrested by CCSO deputies on misdemeanor drug charges. He was booked into the Jail Annex at approximately 07:34 and placed in Cell 2, according to booking records.

**C.    Failures to Classify and Segregate Violent From Non-Violent Inmates.**

46. On information and belief, and based upon years of TCI Inspection Reports, Corrections Officers at the CCSO routinely fail to conduct background checks to classify and segregate inmates. Predictably, Plaintiff was never properly assessed by his booking officer, Defendant Aaron Raines. The booking sheet indicated that Plaintiff was not violent and not a felon. Officer Raines failed to do his job, and his supervisor, Lt. Colton, endorsed that failure.[13] Plaintiff

---

[13]Sadly, corrections officers routinely ignore inmate criminal histories before classifying inmates and making cell assignments, as they are required to do. https://www.nashvillescene.com/news/features/article/21106770/tennessees-county-jails-are-plagued-by-overcrowding-and-underfunding

-13-

was assigned to the Jail Annex, Cell 2, where a group of violent felons, including Dustin Williams ("Williams") and Dalton McNeely ("McNeely"), awaited him.[14]

**D. Plaintiff Is Brutally Assaulted By Inmates, As Corrections Officers and Nurses Are Absent and Fail to Check on Him for Approximately Twelve Hours.**

47      Plaintiff was escorted to Cell 2. When he entered, a couple of guys said "hello" and asked his name. Plaintiff responded and found an open bunk in the far-right corner on the cell, climbed up on it, and fell asleep.

48.      Approximately a half hour later, Plaintiff was awakened by the vicious blows of three or four men hitting him. He was knocked off the bunk into the floor, peddled backwards to get away, and was knocked unconscious. The men stomped on him. He was knocked out again as he was lying on the floor. When Plaintiff regained consciousness, he was in the shower, where his assailants had dragged him and doused him with water. At that pount, the men started hitting and kicking Plaintiff again while he was lying on the shower floor. When they dragged him out of the shower and back into his cell, they continued beating and kicking him until he was again unconscious. When he finally awoke, he was behind the bunks on the right side of Cell 2.[15]

49.      No one broke up the beating, which lasted at least half an hour or longer. The assailants apparently just got tired of beating Plaintiff. He does not know the assailants' motive for beating him. He was so disoriented that he remembers some but not all of the details. No incident

---

[14]There were reasonable alternatives to placing Plaintiff in Cell 2 with violent inmates, which would have avoided the substantial risk of injury to Plaintiff.

[15]Of course, if video of the incident existed and was available, many questions regarding the beating and the identity of the assailants would likely be answered. Video might also shed light on why no correctionthe Plaintiff from the time he was booked (07:34) until almost exactly twelve hours later. However, Cocke County has informed Plaintiff's attorney that no video of the incident exists.

-14-

report was ever prepared or submitted by Corrections Officers. No investigation was ever conducted, by anyone. No internal investigation was conducted by the CCSO or otherwise. And no one was ever charged with a crime.

50. From that moment in the early morning on March 19, 2022, until about 7:35 p.m. that evening, approximately twelve hours, Plaintiff was in his cell, beaten, concussed, lacerated, bruised, swollen, bloodied, in agony, and in obvious medical distress. Not a single Corrections Officer or nurse made any effort to check on him. No security checks. No medical checks. No Corrections Officer even noticed him when they were passing out food trays throughout the day. Meanwhile, Plaintiff could not open his mouth, as the blows had injured his jaw, making it almost impossible to talk. For all these hours, fearing for his life and believing the men would ultimately finish the job and kill him, he waited. But no one came.

51. Finally, at about 7:35 p.m. on March 20, 2022 (if shift notes are to be believed), Officers Wills and another Officer named "Yarbrough" or "Yarborough" happened by the cell, either to drop off pants to an inmate or to bring around food trays. There, they encountered the battered, cut, bruised, and bleeding Plaintiff, with blood splattered all over his orange shirt and pants, barely able to talk because he could not move his mouth. Plaintiff pleaded – as best as he could – for medical help and asked to be moved, begging to be taken to the hospital.

52. When Plaintiff tried to tell the officers that he thought his jaw was broken, they got aggravated and told him nothing was wrong with him. Plaintiff persisted and Wills and Yarbrough finally took him to the control room. There, Lt. Rollins "cleaned up his wounds" and called Sherry Lawson, a QCHC nurse via "Facetime."[16]

_____

[16]QCHC had no doctor at the Jail during the period in which Plaintiff was incarcerated there.

-15-

53.     Lawson, hearing that Plaintiff had lost consciousness, seeing that he had multiple lacerations, bruising, and swelling about his head and face, and being told that Plaintiff could not open his mouth due to an excruciatingly painful jaw injury, told them she would "check him out in the morning" and recommended "an ice pack for his jaw and two Tylenols for the pain." According to Nurse Lawson, all he had was a laceration to his lip. Plaintiff was moved into a medical cell.

54.     In the medical cell, Plaintiff's condition worsened and he asked for medical attention. Other inmates in the medical cell, witnessing his plight, pleaded for help on his behalf. On the morning of March 20, 2022, unable to even open his mouth, Plaintiff pleaded with corrections officers to be seen by a nurse.

55.     He saw either Nurse Stephanie Cartwright or Nurse Lawson again, in-person this time. The nurse squeezed his jaw, told him it was not broken, gave him an ibuprofen, and sent him away. She did not try to explain why Plaintiff was unable to open his mouth or why it hurt so bad. But she did put him on a soft diet because he could not chew.

E.     **Plaintiff Finally Received Medical Care and Undergoes Emergency Surgery to Repair Multiple Jaw Fractures and Teeth Extraction.**

56.     At last, by approximately 9:00 that evening, Plaintiff's mother bailed him out of jail. In the coming days, Plaintiff visited an ER and a dentist, who quickly saw that Plaintiff's jaw was fractured and that he needed immediate medical attention. The dentist advised him to go to the University of Tennessee Medical Center ("UTMC").

57.     At UTMC, ER doctors diagnosed Plaintiff with facial trauma, a non-displaced left mandibular angle fracture, a right mandibular parasymphyseal fracture, a fully-erupted tooth, and a partially-impacted tooth. Dr. John Mizukawa performed surgery to repair and close the fractures and extract the teeth. Plaintiff's medical bills totaled approximately $34,000.

-16-

**F.** **The Extent of Corrections Officers's Failures to Reasonable Safeguard Plaintiff Before He Was Brutally Beaten By Inmates.**

58.     Due to overcrowding and under-staffing, security checks on inmates were not being actually performed in the Jail Annex with the frequency recommended by the TCI or specified by Jail policy. This, it appears, is common at the Jail. Notwithstanding jail standards, procedures, or logs, Corrections Officers do not routinely monitor inmates or perform safety or security checks. While Corrections Officers often "check-off" the log to show that a security check was made at a certain time, other evidence indicates that such checks were not actually being made. After all, if Corrections Officers had performed 15-minute, half-hour, or even hourly checks, it is unlikely they would have missed a beating involving numerous inmates that lasted 30 or 45 minutes, or that they would have missed a beaten and bloodied inmate begging for help for an entire day.

59.     From the moment Plaintiff was booked into the Jail, his name appears on the shift log a total of eight times:

| | |
|---|---|
| 3/19/22, 07:50 | when he was booked (Officer Norton); |
| 3/19/22, 09:04 | when money was placed on his books (Officer Norton); |
| 3/19/22, 09:45 | when $20 of Plaintiff's money was placed in safe (Officer Stump); |
| 3/20/22, 00:19 | when he got the attention of Officers Wills and Yarbrough at 19:35 (Lt. Rollins); |
| 3/20/22, 02:32 | when he was cleaned up (Lt. Rollins); |
| 3/20/22, 15:02 | when he was taken off medical watch (Officer Stump); |
| 3/20/22, 19:31 | when his mother came to visit was not permitted to see him (Lt. Rollins); and |

-17-

3/20/22, 21:07        when he was released (Officer Raines).

60.    The booking report shows that Plaintiff was processed at 7:34 on March 19, 2022.

61.    The log clearly indicates that after he was booked, Plaintiff was not checked on for another twelve hours, approximately eleven hours after he had been brutally beaten in his cell, in the shower, and in the cell again.

62.    At 09:05 on March 19, 2022, Nurse Cartwright was in the Annex doing a med pass. At 09:40, and again at 09:50, on March 19, 2022, about an hour or so after Plaintiff had been beaten, Officer Norton noted that a med pass was being completed in the Annex.  Plaintiff was not checked on at any of these times.

63.    At 16:04 on March 19, 2022, Nurse Cartwright and Officer Ball performed "sick calls" in the Annex, where Plaintiff was lying in his cell. They did not check on him.

64.    Shift notes indicate that cell checks were being performed; or at least, someone is saying so in the log, usually Officers Norton or Stump. Such checks would appear to be even more necessary considering that the Jail Annex has no video cameras for inmate monitoring. If officers were actually doing regular security checks, it is likely they would have seen or heard the inmates beating Plaintiff for half an hour or longer, seen inmates dragging a bloodied Plaintiff to the showers and back to his cell, or seen Plaintiff after he was beaten and bloodied at some point over a twelve hour period on March 19, 2022. But by their accounts, none of these Corrections Officer saw anything as they walked through the Annex checking on inmates every hour or so.

-18-

65.     On information and belief, former Sheriff Fontes and Chief Hartsell knew that their Corrections Officers were not following minimum jail standards and policies and not actually making regular security checks. Yet, they failed to correct this, knowing all along that such a failure would likely result – and did result – in harm to inmates.

66.     From the time Plaintiff was placed in his cell until the time he approached Officers Wills and "Yarbrough" at about 19:35 on March 19, 2022, security checks were purportedly performed in the Annex by Lt. Rollins, Officers Norton, Ball, Rutkiewicz, Raines, Wills, and "Yarbrough." Yet, not once over an eleven hour period was reference made to a beaten, injured, and bloodied inmate whose need for medical attention was serious and obvious to the naked eye the beatee.

67.     Food trays were also delivered by Officers Stump and Norton (and maybe others) multiple times during the day on March 19, 2022; yet, no one hinted about finding the beaten Plaintiff in his cell.

68.     For years, the Jail has been referred to by inmates, corrections officers, and attorneys alike as "the Wild Wild West" because of the free reign granted violent inmates there, particularly inmates already convicted of violent crimes and felonies. That a group of such inmates could beat another inmate unconscious over the course of 30-45 minutes, drag him to the showers, beat him again, and then drag him back to the cell and continue the beating – and never once get the attention of a single Corrections Officer, leaves no doubt the moniker was well-earned.

-19-

### G. Unsafe Jail Conditions: Antiquated Facilities, Overcrowding, Under-staffing, and Unqualified Officers

*"There's no sense that anybody should have to live like this."*[17]

69.     Sheriff Fontes told the County Commission, Cocke County's governing body, that the Jail "basically feels like a sauna." In fact, inmates have described Jail conditions as "nasty." The showers do not function properly ("they're all messed up," one said) and the ceiling leaks so bad when it rains that inmates sometimes sleep on the floor just to keep from getting wet. "There's leaky roofs, there's inadequate clothing," Commissioner Forest Clevenger said. In a media interview with WVLT-TV, former Chief Deputy Derrick Woods pointed out rotting ceilings, leaks, and holes in the floor of the Jail.[18] Sheriff Fontes acknowledged the Jail is "antiquated and out of date."[19] "These are human beings and they should be treated like human beings," Clevenger said. "We're obligated by the laws of this country and laws of the state to provide adequate shelter for these people and we are not doing it."

70.     In addition to being hot, "nasty," leaky, rotting, etc., Sheriff Fontes told WVLT-TV that "one of the reasons why our jail was de-certified" was "because of the fact of overcrowdedness . . . ."[20] Sheriff Fontes informed County Commissioners that the Jail is "grossly overcrowded and under staffed," and that "this is a serious risk of safety, and a serious liability for the county."[21]

---

[17] A Cocke County Jail inmate, speaking to a WBIR-TV news reporter.

[18] https://www.wvlt.tv/content/news/Cocke-County-leaders-address-courthouse-security-and-jail-issues-450489593.html.

[19] *Id.*

[20] *Id.*

[21] *See* "*Sheriff: Cocke Co. Jail Is 'Inhumane,' Poses a 'Serious Risk to Safety'*" https://www.13wmaz.com/article/news/local/sheriff-cocke-co-jail-is-inhumane-poses-a-serious-r

These conditions, Sheriff Fontes told one reporter, also prevent him from properly segregating inmates.[22]

71. By the time Plaintiff entered the Jail Annex in March 19, 2022, the Jail was in the midst of an ten-year period of continuous overcrowding, exceeding its 120-person capacity by between *200% and 310%.* In January 2020, for example, the Jail was *262.5% beyond capacity*, with 215 inmates.[23]

72. County officials know – through years of failed inspections, multiple lawsuits alleging civil rights violations, and hundreds of inmate-on-inmate beatings[24] – that Jail conditions are inhumane and overcrowded, and that inmate-on-inmate assaults are almost a daily occurrence. Still, they did nothing to fix the conditions, provide adequate resources, or fund a new Jail.[25]

73. The TCI found that overcrowding at the Jail has led to a rise in inmate-on-inmate

---

isk-to-safety/51-e59b4b4a-fc84-4314-9580-a0315c3a172f

[22]*Id.*

[23]In fact, summary report-data provided by the Tennessee Corrections Institute ("TCI"), dating back to the year 2000, indicates that since 2011, only one County in the state (Van Buren) has consistently had a larger overcapacity percentage of inmates in its jail than Cocke County Jail. *See* historical TCI Jail Summary Reports https://www.tn.gov/correction/statistics-and-information/jail-summary-reports.html.

[24]In 2018, more than 50 assaults were recorded between inmates and Jail officers. *See* "*Overcrowding Breeds Ugly Fights Inside Cocke County Jail*," WVLT TV, Jan. 31, 2020, available at https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail567474631.html (last accessed March 19, 2023). More than 50 inmate-on-inmate assaults occurred again in 2019 and 2020.

[25]*See* "*Overcrowding Breeds Ugly Fights Inside Cocke County Jail*,' WVLT TV, Jan. 31, 2020, available at https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail567474631.html (last accessed March 19, 2023) (Sheriff Fontes: "This is not a new issue – it's been here along time.").

assaults. It "strongly recommended" that the County fund additional Jail staff, and take steps to update the Jail's "deteriorating" buildings.[26]

74.     The TCI's recommendation had little or no effect on improving conditions at the Jail. "Although this is definitely an issue that we take seriously, and it's an issue, it's one in a series of issues," Clay Blazer, then chairman of the County Commission, told WVLT-TV. According to Blazer, there are not enough funds for a new jail.[27]

75.     In fact, the County Commission has been so disinterested with Jail conditions that when the issue was on the body's meeting agenda for discussion, so few Commissioners attended the meeting that the body lacked a quorum to even conduct official business.

76.     The unsafe Jail conditions also put inmates' safety at risk, as Sheriff Fontes conceded that overcrowding is a breeding ground for fights between inmates.[28] Inmates are locked away in dorm-style cells, sometimes shared between more than 25 different people. "When you're in a large

---

[26]https://www.nashvillescene.com/news/features/article/21106770/tennessees-county-jails-are-plagued-by-overcrowding-and-underfunding

[27]https://www.wvlt.tv/content/news/Cocke-County-leaders-address-courthouse-security-and-jail-issues-450489593.html

[28] *"Overcrowding Breeds Ugly Fights Inside Cocke County Jail"* (Jan. 31, 2020) https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail-567474631.html

-22-

group – it's like a street gang. They all feed off each other," Sheriff Fontes said.[29] "Put yourself in their shoes. Imagine being locked in a cell 24 hours a day, 7 days a week, with 24 other people."[30]

77.     Sheriff Fontes also conceded that fights are commonplace in the Jail, which forces Correction Officers to break them up – with few holding cells to separate inmates. He further acknowledged that liability comes with these conditions, stating that "a jail is a community's largest liability when it comes to lawsuits," confessing that "This is not a new issue – it's been here a long time."[31]

78.     Along with run-down facilities, overcrowding, under-staffing, and increasing inmate-on-inmate assaults, the Jail is also staffed by inexperienced corrections officers. Sheriff Fontes told the media: "You don't get good quality people – you get a young person looking for a job who lacks the life experiences to help them handle situations. They need to be the ones who are patient and calm and not react to a mouthy inmate or someone who's being belligerent." It is commonplace for five or fewer officers to manage the two Jails, "resulting in decreased safety and security."[32]

79.     Systemic deficiencies in facilities, procedures or staffing can amount to a pattern of deliberate indifference.

---

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]https://www.nashvillescene.com/news/features/article/21106770/tennessees-county-jails-are-plagued-by-overcrowding-and-underfunding

-23-

### H. Failed Inspections and Decertification

80.     For a number of years, the Jail has failed to satisfy even the minimum standards to achieve state-certification. Inspectors for the TCI have reported "alarming deficiencies regarding the structure of the building, security, and medical services," all which they relate to jail overcrowding and under-staffing.

81.     In repeatedly refusing to certify the Jail on inspection after inspection over the past six years, TCI inspectors have found, among many others, the following:

- the Jail and Jail Annex are overcrowded and understaffed,

- under-staffing makes "it virtually impossible to meet the needs of the facility and perform the required task to ensure safety and security,"

- "limited staff is affecting the ability to perform required functions relating to security, custody, and supervision of inmates,"

- insufficient staffing is resulting in security checks being conducted visually by camera,

- security checks on inmates are not being timely properly conducted,

- poor "staff performance quality,"

- Jail staff cannot properly supervise inmates, and

- Jail staff is inadequately trained.

82.     More recent inspections of the Jail and Jail Annex by TCI inspectors revealed:

- "limited staff is affecting the ability to perform required functions relating to security, custody, and supervision of inmates,"

- "security checks" on inmates "are negatively affected due to minimal staffing availability and inability to respond to needed duties,"

-24-

- "[m]any of the deficiencies" in the Jail and Jail Annex "are a result of inmate overcrowding and minimal staff available to perform the task required,"

- the Jail and Jail Annex have consistently failed to provide "appropriate housing of inmates for classification purposes,"

- "Criminal Histories on inmates for classification purposes are not being completed on inmates prior to placement in general population,"

- "[w]ith the continued rise in the inmate population, proper classification of inmates is unattainable," and

- "there is insufficient housing to accommodate overcrowding conditions."

83. The County, Sheriff Fontes, and Chief Hartsell knew the TCI had decertified the Jail and Jail Annex in 2017 "after two years of failed inspections and warnings about lax employee training, staffing shortages, inadequate medical care and safety violations[.]"[33]

84. On September 7, 2017, Mayor Crystal Ottinger and Sheriff Fontes appeared before the Cocke County Corrections Partnership workshop to discuss their recent appearance before the TCI. Mayor Ottinger bluntly stated that the TCI's review committee indicated that the Jail was not re-certified because the committee "believes *it is unsafe for inmates and staff*."

85. The 2018 TCI report condemned the Jail's "deficiencies . . . related to the continued overcrowded conditions as well as the outdated, deteriorating, and antiquated facility," noting "[t]his serious situation is only heightened by the need for additional staff on each shift to provide the

---

[33]"*Cocke County Loses Jail Certification*," Knox News, Oct. 4, 2017, available at https://www.knoxnews.com/story/news/crime/2017/10/04/cocke-county-loses-jail-certificationgarners-lawsuit-over-32-year-old-inmates-death/725437001/ (last accessed March 19, 2023).

-25-

necessary supervision throughout the facility." It also criticized excessive turnover: "[t]he current budget allows for 25 full-time officers, which fails to meet the minimum number of staff required."

I.     **Circumstances Require Discovery to Permit Plaintiff to More Precisely Allege His Claims.**

86.    Plaintiff was compelled to file this Complaint without the benefit of information available only to the Defendants. Plaintiff was beaten so viciously that he lost consciousness and cannot recall certain specific details about the assault and its aftermath. Finally, more precise allegations might have been made if the County had more fully responded to Plaintiff's public records request. Accordingly, some of the allegations herein have been made upon information and belief, after a full investigation.

## V.  WAIVER OF IMMUNITY

87.    The County and QCHC have waived immunity for their negligence and the negligence of their employees, misconduct of deputies acting under color of law, and for the negligence of deputies or employees of the County, as set out in Tenn. Code Ann. §29-20-305, and for intentional acts or misconduct done by deputies under color of law, as set out in Tenn. Code Ann. §8-8-302-302.

88.    There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

-26-

## VI. CLAIMS FOR RELIEF

## COUNT I

## FAILURE TO PROTECT

## VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF LAW
## 42 U.S.C. § § 1983 and 1988

### Under the Fourth, Eighth, and/or Fourteenth Amendments
### (Against Sheriff Fontes and Chief Hartsell)

89.     Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

90.     Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the United States Constitution and federal laws. Here, Sheriff Fontes and Chief Hartsell were acting under color of state law.

91.     From the moment of Plaintiff's incarceration, the County, Sheriff Fontes and Chief Hartsell owed him a duty of care to protect him from harm. A special relationship existed between Plaintiff and those Defendants, which gave rise to that duty and they breached their duty by failing to protect him.

92.     At the time of the assault, the law was clearly established that Defendants' deliberate indifference to the safety of inmates from harm is a constitutional violation.

93.     When Plaintiff, an alleged misdemeanor drug offender, was booked, he was incarcerated under conditions that posed a substantial risk of harm to his physical safety, *e.g.*, assigned to an overcrowded cell shared by violent convicted felons. Defendants knew or should have known of this risk, yet they failed to abate or even mitigate it.

-27-

94.     Sheriff Fontes and Chief Hartsell, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Plaintiff's safety, and to the safety of other inmates, by, among other things:

- failing to take action to ameliorate the chronic and persistent overcrowding;

- failing to hire, train, and supervise qualified Corrections Officers to work and supervise inmates;

- failing to implement effective policies or procedures to properly classify inmates and then segregated non-violent inmates from violent inmates;

- failing to implement policies or procedures to insure that one or more Corrections Officers can rapidly respond to inmate-distress alerts in the Jail Annex, where dozens of inmates – many of whom were violent – are housed; and

- failing to implement policies or procedures to insure that Corrections Officers perform regular and routine security checks on inmates.

95.     As demonstrated by repeated public statements and official reports, County officials, including former Mayor Ottinger, the Board of Commissioners, Sheriff Fontes, and Chief Hartsell, knew – for many years – that the Jails were overcrowded, understaffed, and unable to provide safe and secure facilities for the inmates it housed due to lack of resources. Despite this knowledge, those County officials failed to address these serious problems. The County, the Sheriff, and Chief of Corrections acted with deliberate indifference to the substantial risk of serious harm to inmates such as the Plaintiff.

96.     Sheriff Fontes and Chief Hartsell are supervisory officials for the CCSO and are responsible for the implementation of policies and procedures regarding the booking, classification, and segregation of inmates, and all measures to insure inmate safety and security.

-28-

97.     The County, Sheriff Fontes, and Chief Hartsell also knew that the Corrections Officers were ill-experienced, ill-trained, and otherwise ill-equipped to deal with the tense Jail environment created by the unsafe conditions of confinement.

98.     At all times material hereto, CCSO, Sheriff Fontes, and Chief Hartsell knew that Corrections Officers, including Lt. Rollins and Officer Raines, were knowingly or recklessly housing dangerously violent inmates with non-violent inmates or inmates at risk of assault, creating the potential for inmate-violence.

99.     At all times material hereto, Sheriff Fontes and Chief Hartsell also had the authority and ability to segregate inmates according to their propensity for violence and to instruct Corrections Officers to segregate inmates accordingly. *See* Tenn. Code Ann. § 41-4-103.

100.     On information and belief, Sheriff Fontes and Chief Hartsell knew that Corrections Officers were disregarding the violent criminal histories of inmates and intentionally or recklessly placing convicted violent felony offenders with non-violent inmates, notwithstanding the risk of harm to those non-violent offenders. Yet, they failed to correct this and failed to implement a proper classification system, knowing their failure would likely result – and has resulted – in physical harm to weaker, non-violent inmates by habitually violent offenders.

101.     As supervisory officials, Sheriff Fontes and Chief Hartsell were well aware that the failure to have an adequate classification and/or segregation system would result in increased instances of inmate-on-inmate assault, like the assault on Plaintiff, and the other assaults. Nevertheless, on information and belief, they created a substantial risk of harm to Plaintiff and other inmates by implementing or ratifying policies, practices, and/or customs that deprived Plaintiff of his right to be free from physical assault while confined in the Jail, including:

-29-

■ accepting prisoners despite well beyond the maximum capacity;

■ failing to take measures at their disposal to reduce the inmate population;

■ failing to implement a proper classification system so as to segregate known violent inmates from non-violent inmates; and

■ failing to staff the Jail with competent and qualified officers to insure that inmates are properly classified at booking, housed accordingly, and supervised at all times.

102. Sheriff Fontes and Chief Hartsell acted with "deliberate indifference" to the safety of Plaintiff. They knew of and inexplicably disregarded the substantial risk to Plaintiff's health or safety.

103. The substantial risk of inmate attacks at the Jail Annex is longstanding, pervasive, and well-documented. Because Sheriff Fontes and Chief Hartsell have continuously been exposed to reliable information concerning the risks, *e.g.*, via incident reports of assaults, TCI inspections and reports, frequent media investigations and news reports, lawsuits, they must have known about it. Nevertheless, the risks were so obvious that they had to have been known. Neither official took action to respond reasonably to the risk.

104. These officials also knew that by (1) routinely failing to properly classify inmates based upon the seriousness of their offenses and propensity for violence, as Lt. Rollins and Officer Raines had done in Plaintiff's case, and (2) routinely failing to station sufficient Corrections Officers inside the Jail Annex to supervise the dozens of inmates there or at least doing regular security checks, they were being deliberately indifferent to or tacitly authorizing those practices. If Plaintiff

-30-

had been properly segregated, and/or if sufficient Corrections Officers had been stationed inside the Jail Annex supervising the dozens of inmates housed there or performing regular security checks, it is likely that Plaintiff would not have suffered serious injuries.

105.    As a direct and proximate result of the acts or omissions of these Defendants, Plaintiff suffered serious injuries, including head trauma, a concussion, multiple jaw fractures requiring emergency surgery, head and facial lacerations, bruises, swelling, injuries to his neck, back, and hip, as well as psychological trauma associated with the brutal attack.

106.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT TWO

## FAILURE TO PROTECT

## VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF LAW
## 42 U.S.C. § § 1983 and 1988

### Under the Fourth, Eighth, and/or Fourteenth Amendments
### (Against Lt. Rollins and Officers Stump, Norton,
### Ball, Raines, Rutkiewicz, and Wills, All Individually)

107.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

108.    Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills were all acting under color of state law.

109.    As a result of the special relationship that existed between Plaintiff and Lt. Rolins and these Officers, they also owed Plaintiff a duty of care to protect him from harm. They breached that duty by failing to protect him.

-31-

110.    At the time of this incident, the law was clearly established that deliberate indifference to the safety of inmates from harm is unconstitutional.

111.    The substantial risk of inmate attacks at the Jail Annex is longstanding, pervasive, well-documented, and has been expressly acknowledged by County officials. The circumstances suggest that Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills – each having acknowledged (by signature) receipt of CCSO policies and TCI's minimum standards, and having been exposed to reliable information concerning the risks (*e.g.*, frequent media investigations and news reports) –  must have known about the risks to inmates like Plaintiff. Accordingly, Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills cannot hide behind the excuse that they were unaware of such risks.

112.    Upon information and belief, Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills all had knowledge of the violent criminal histories of the inmates who occupied the cell to which Plaintiff was assigned, as well as Plaintiff's lack of such criminal history; yet, Lt. Rollins and Officer Raines inexplicably assigned Plaintiff to the same cell as convicted violent felons (Cell 2 of the Jail Annex).

113.    By failing to segregate Plaintiff from violent inmates, Lt. Rollins and Officer Raines, who booked and assigned Plaintiff to Cell 2, acted with deliberate indifference to Plaintiff's constitutional rights.

114.    Regardless of what prompted the assault on the Plaintiff, it likely would not have happened if Lt. Rollins and Officer Raines had not placed Plaintiff in the same cell as convicted violent felons.

-32-

115.     Plaintiff faced a substantial risk of serious harm, and Lt. Rollins and Officer Raines acted with deliberate indifference to that risk, causing Plaintiff's serious injuries.

116.     Knowing that the Jail Annex lacked sufficient Corrections Officers, Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills failed to take measures to prevent or mitigate the substantial risk of assault on the Plaintiff.

117.     For instance, Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills failed to follow Jail policy by not conducting timely security checks at regular intervals. If they had, they would have had an opportunity to interrupt the 30-45 minute-long beating of Plaintiff, or they may have seen Plaintiff being dragged by inmates into the showers, where he was beaten and kicked unconscious yet again, or seen Plaintiff dragged back to his cell by the assailants, only to be beaten and kicked unconscious.

118.     The booking report shows that Plaintiff was processed at 7:34 on March 19, 2022; yet, Plaintiff was not checked on *for another twelve hours*, approximately eleven hours after he had been brutally beaten in his cell, in the shower, and in the cell again.

119.     Corrections Officers accompany nurses when they are tending to inmates in the Jail. Yet, when Nurse Cartwright was in the Annex doing a med pass on the morning of March 19, 2022, about an hour after Plaintiff had been beaten, no Corrections Officer checked on Plaintiff. Nor did Officer Ball check on Plaintiff when he was accompanying Nurse Cartwright on "sick calls" in the Annex later that afternoon.

120.     Because the Jail Annex apparently has no video cameras to monitor inmates, security checks are even more important than normal to safeguard non-violent inmates from known violent inmates stalking the Jail. If any of these Officers had actually performed a security check in the

-33-

Annex – from the time Plaintiff was brutally beaten in his cell, beaten again in the showers, and beaten yet again in his cell – they would have seen or heard the inmates beating Plaintiff or noticed Plaintiff at some point over that twelve-hour period on March 19, 2022. By the accounts of Lt. Rollins and Officers Norton and Stump and others, none of the Officers saw or heard anything with respect to Plaintiff as they purportedly walked through the Annex checking on inmates every few minutes during that period.

121.    Nor, for that matter, did Officers Stump and Norton or others check on or notice Plaintiff as they delivered food trays throughout the day on March 19, 2022. Yet, by breakfast, Plaintiff was lying beaten and bloodied in his cell.

122.    As a direct and proximate result of the acts or omissions of Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills, Plaintiff suffered serious injuries, including head trauma, a concussion, multiple jaw fractures requiring emergency surgery, head and facial lacerations, bruises, swelling, injuries to his neck, back, and hip, as well as the emotional trauma associated with the brutal attack. By not discovering Plaintiff sooner, as should have happened, Plaintiff's multiple jaw fractures progressively worsened and he was not treated for serious head trauma (a concussion).

123.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

-34-

## COUNT THREE

### POLICY, CUSTOM, AND PRACTICE OF UNSAFE CONDITIONS OF CONFINEMENT AND DELIBERATE INDIFFERENCE TO INMATE SAFETY (MUNICIPAL LIABILITY)

### VIOLATION OF CIVIL RIGHTS LAWS UNDER COLOR OF LAW
### 42 U.S.C. § § 1983 and 1988

#### Under the Fourth, Eighth, and/or Fourteenth Amendments
#### (Against Cocke County)

124.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

125.    From the moment of Plaintiff's incarceration, the County owed him a duty of care to protect him from harm. A special relationship existed between the County and Plaintiff which gave riset to that duty.

126.    The County breached its duty to Plaintiff by subjecting him to conditions of confinement so deplorable and unsafe that they created a substantial risk of harm to him. As a result, Plaintiff was savagely beaten by other inmates and seriously injured.

127.    At the time Plaintiff was savagely beaten by inmates in the Jail Annex, the law was clearly established that deliberate indifference to the safety of inmates from harm is a constitutional violation.

128.    A governmental entity may be held liable based upon its officers' deliberate indifference to and violation of any citizen's constitutional rights where a custom, policy, or procedure of the municipality is found to be the proximate cause of the constitutional violation.

129.    Dating back to the year 2011, only one Tennessee county (Van Buren) has consistently had a larger overcapacity percentage of inmates in its jail than Cocke County. For no

-35-

fewer than ten consecutive years, the Jail has exceeded its 120-person maximum capacity for housing inmates. At times, the Jail has been over *300% beyond capacity*.

130. The County's Mayor, Board of Commissioners, Sheriff, and Chief of Corrections have long-known that Jail conditions are inhumane. They also have long-known that these and other conditions have given way to a mounting number of inmate-on-inmate assaults, becoming an almost daily occurrence. Yet, the County has done little or nothing to alleviate these unsafe conditions, which have created an unconstitutionally high level of violence at the Jail and Jail Annex.

131. The Jail has not been certified by the TCI since 2017. Repeated failed inspections and decertification of the Jail by the TCI have made little or no difference, as the County Commission is simply not interested in insuring the safety of inmates arrested and put in the County's care. The former Sheriff has stated that these conditions have made the Jail "a breeding ground for fights between inmates," comparing some cells to "street gangs." Equally deplorable is the County's small staff of inexperienced and unqualified officers, which "result[s] in decreased safety and security."

132. These systemic deficiencies amount to a pattern of deliberate indifference to the safety of inmates. The conditions are hardly disputed by the former Mayor and former Sheriff, with the former Mayor not disputing that the Jail *"is unsafe for inmates and staff."*

133. The results of these deficiencies are startling, ranging from policy violations by now-terminated Corrections Officers, to officer-corruption and criminal indictments, to increasing inmate-violence, and to constitutional violations causing inmate-injuries and even deaths.

134. The failure to remedy overcrowding, under-staffing, and other unsafe conditions is so pervasive as to constitute an actual policy, practice, or custom on the part of the County not to protect non-violent inmates from wanton violence of other inmates. After all, County officials have

-36-

admitted that overcrowding and under-staffing are the root-cause of inmate-on-inmate violence at the Jail.

135.    What is more, the Jail's rudimentary inmate-classification/segregation system – if it actually exists – does not function. There are no areas in the Jail assigned to violent or non-violent inmates or particular categories of offenses. A wide variety of inmates are housed in particular areas, like Cell 2 in the Jail Annex, casting serious doubt as to the success of any efforts to separate violent from non-violent inmates. There is a widespread failure to separate inmates with violent propensities from non-violent inmates. Inmates charged with or convicted of non-violent offenses with relatively low bonds, convicted of non-violent misdemeanors, pretrial detainees charged with extremely serious and violent crimes with high bonds and individuals convicted of one or more serious violent crimes are indiscriminately distributed throughout the Jail.

136.    Under the current "system," Jail officials do not obtain or utilize much information pertinent to a determination of whether an inmate is violent or non-violent. Thus, there is no effective separation of violent and non-violent inmates.

137.    Inmates are exposed to constitutionally-impermissible violence and threat of personal harm in violation of their Fourth, Eighth, and/or Fourteenth Amendment rights. Jail records, inmate statements, and statements of County officials reveal that violence within the Jail is pervasive and a very serious problem. This increasing level of violence is attributable to a number of root causes, including:

> ■ severe overcrowding (crowding increases contact between people and thus provides opportunities and incentives to violent behavior);

-37-

- lack of staff to observe inmate-behavior (number of corrections officers is inadequate for Jail, as officers leave the Jail Annex largely unattended and cannot check on and supervise inmates, staff turnover is exceedingly high, and staff is largely inexperienced); and

- an inadequate classification system (a mixed bag of inmates are housed in each cell).

138.    Statistics provide an incomplete picture of Jail violence. Given the difficulty in patrolling the living areas, Corrections Officers do not observe many minor fights. Since many inmates are afraid to tell them of an incident or to identify an attacker, it is reasonable to believe that some violent incidents are unreported.

139.    Here, the County, former Sheriff Fontes, and Chief Hartsell made an intentional decision with respect to the conditions and policies under which Plaintiff was confined. Those conditions and policies subjected Plaintiff to a substantial risk of serious harm. For whatever reason, the County failed to take any reasonable measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the Defendants' conduct obvious. By not taking such measures, the County caused Plaintiff to suffer serious injuries.

140.    These historical acts or omissions – regarding chronic overcrowding and under-staffing, regarding the hiring of unqualified Jail staff, regarding the failure or inability to classify inmates or segregate violent from non-violent inmates, and regarding the failure to post sufficient corrections-staff in the Jail Annex, where dozens of violent inmates are housed – are indicative of a custom, policy, or practice of deliberate indifference to inmate safety at the Jail.

-38-

141.     The County maintained a policy and practice of overcrowding and inadequate supervision at the Jail that allow for inmate-on-inmate violence. This policy was a moving force behind the constitutional violation alleged herein.

142.     But for these unconstitutional customs, policies, or practices, former Sheriff Fontes, Chief Hartsell, and the Correction Officer-Defendants would not have exhibited deliberate indifference to Plaintiff's safety during his incarceration, but would have addressed the inmate overcrowding and under-staffing problems, would have hired qualified individuals supervise inmates, would have properly classified Plaintiff (instead of putting him in a cell with violent offenders), and would have posted sufficient corrections-staff inside the Jail Annex to supervise inmates, or implemented a policy of regular and routine security checks (instead of staff being located in another facility).

143.     In this case, the policy, practices, customs, and procedures of the County, as described herein, were substantial factors in the violation of Plaintiff's rights and the serious injuries suffered by him.

144.     For all of these reasons, the County has abdicated its governmental responsibilities to provide a safe and secure incarceration environment to inmates.

145.     As a direct and proximate result of the foregoing acts or omissions of the County, Plaintiff suffered serious injuries, including head trauma, a concussion, multiple jaw fractures requiring emergency surgery, head and facial lacerations, bruises, swelling, injuries to his neck, back, and hip, as well as the emotional trauma associated with the brutal attack.

146.     Plaintiff therefore seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

-39-

## COUNT FOUR

## FAILURE TO TRAIN AND SUPERVISE

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
### 42 U.S.C. §§ 1983 and 1988

### Under Fourth, Eighth, and/or Fourteenth Amendments
### (Against Cocke County, Sheriff Fontes, and Chief Hartsell)

147. Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

148. The County, former Sheriff Fontes, and Chief Hartsell had a duty to train and supervise Corrections Officers.

149. Each official failed to adequately train their Corrections Officers. They failed to properly train and supervise Lt. Rollins and Officer Raines and others to classify inmates and segregate violent inmates from non-violent inmates. They also failed to properly train and supervise Officers to maintain their posts in the Jail Annex to supervise inmates housed there. They further failed to properly train and supervise Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, Wills, and others to perform regular and routine security checks.

150. Former Sheriff Fontes and Chief Hartsell are supervisory officials for the Jail and were authorized and responsible for development and implementation of Jail policies and procedures to supervise and protect inmates. By their acts and omissions, former Sheriff Fontes and Chief Hartsell established the unconstitutional customs, policies and practices, as described above.

151. The County's policies and practices were deliberately indifferent to the constitutional rights of its inmates under the Fourth, Eighth, and/or Fourteenth Amendments.

-40-

152. As supervisory law enforcement officials, former Sheriff Fontes and Chief Hartsell were well aware that the (a) failure to have an adequate classification and/or segregation system and the (b) failure to post sufficient Corrections Officers in the Jail Annex and/or have Corrections Officers perform regular and routine security checks in inmates would result in increased instances of inmate-on-inmate assault, like the assault on Plaintiff on March 19, 2022. Yet, on information and belief, Sheriff Fontes and Chief Hartsell created a substantial risk of harm to Plaintiff and other inmates by implementing or ratifying policies, practices, and/or customs that deprived Plaintiff of his right to be free from physical assault while confined in the Jail Annex.

153. Here, the need for training is so obvious that failure to do so is deliberate indifference to constitutional rights. What happened to Plaintiff in the Jail is also a situation likely to recur. It is, after all, predictable that an officer lacking specific tools to handle that situation will violate citizens' rights. An inmate-on-inmate assault was a predictable result of former Sheriff Fontes and Chief Hartsell's failure to train correctional staff in classification techniques, to man their posts, and to perform regular and routine security checks.

154. The County, former Sheriff Fontes, and Chief Hartsell failed to create and implement sufficient policies and procedures for the protection of inmates, and to ensure adequate training. They further failed to provide proper staffing, supervision and discipline of employees in order to prevent deliberate indifference to the safety of inmates as occurred here. The resulting policy, practice, of custom was one of indifference to the safety and protection of inmates from violent inmates.

-41-

*Defacto Policy, Practice, or Custom*

155.    The County, former Sheriff Fontes, and Chief Hartsell had a duty of care to Plaintiff and other inmates to ensure that officers were properly trained in the appropriate procedure to protect inmates. The duty further extends to ensure that supervisory officers are properly trained not to overlook or condone unnecessary and unreasonable deprivations of safety. These duties were all breached, as described herein.

156.    The County, through its policies and procedures, has failed to adequately train and supervise its employees, officers and agents to provide inmates adequate safety. Compounding their violation of Plaintiff's civil rights, all supervisory Defendants also failed to coordinate the interactions between jailers and nurses, as no one had fashioned a plan by which that could be done. For instance, no supervisory Defendant observed or required adherence to the provision of the County's contract with QCHC that required that those inmates with significant illnesses be transported to a local hospital for treatment.

157.    By ratifying the acts or omissions of Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills and others, Sheriff Fontes and Chief Hartsell acquiesced in their unconstitutional conduct through the execution of their own job functions.

158.    Upon information and belief, the County has failed to develop a lawful policy of protecting inmates and failed to train its officers and agents in the proper manner in which to protect inmates. No such policy exists, and if it does, it is so ineffectual as to be no policy at all. The

-42-

County's failure to develop lawful policies for the appropriate provision of safety and to properly train officers to follow such guidelines constitute deliberate indifference to the Constitutional rights of citizens.

159.    The actions of Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills, combined with the repeatedly failed TCI inspections, evidence a complete lack of training as to the proper method to protect inmates from violence. The failure of Sheriff Fontes and Chief Hartsell to recognize or appreciate the gravity of such actions implies that they, too, found no wrong in the conduct, giving officers the "green light" to continue to violate the civil rights of inmates in this manner.

160.    Official policy usually exists in the form of written statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy. Prior to the assault on the Plaintiff, the County had developed and maintained a defacto policy, custom, or practice exhibiting deliberate indifference to the deprivation of safety to inmates, which caused violations of Plaintiff's civil rights.

161.    Here, the Corrections Officers rightly believed their actions would not be properly monitored or corrected by supervisory officers and that their misconduct would be tolerated and accepted. The County established, by custom and usage, a de facto policy of allowing the unnecessary/unreasonable deprivations to go unchecked.

162.    As a direct and proximate result of the foregoing acts or omissions of the County, former Sheriff Fontes, and Chief Hartsell, Plaintiff suffered serious injuries, including head trauma, a concussion, multiple jaw fractures requiring emergency surgery, head and facial lacerations,

-43-

bruises, swelling, injuries to his neck, back, and hip, as well as the psychological trauma associated with the brutal attack.

163.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs. Plaintiff is entitled to punitive damages, pursuant to 42 U.S.C. §1988.

**COUNT FIVE**

**DENIAL OF MEDICAL CARE OR FAILURE
TO PROVIDE ADEQUATE MEDICAL CARE**

**VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
42 U.S.C. §§ 1983 and 1988**

**Under Fourth, Eighth, and/or Fourteenth Amendments
(Against Lt. Rollins, Officer Wills, Nurse Lawson,
and Nurse Cartwright, All Individually)**

164.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

165.    Lt. Rollins, Officer Wills, Nurse Lawson, and Nurse Cartwright were each acting under color of state law.

166.    The Fourteenth Amendment to the United States Constitution requires that pretrial detainees be provided adequate medical care while in the custody of any governmental entity.

167.    An individual officer engages in conduct in violation of the Due Process Clause of the Fourteenth Amendment where he or she demonstrates deliberate indifference to the serious needs of a pre-trial detainee, such as Plaintiff, by intentionally denying or delaying adequate medical care for said person. Here, a reasonable layperson would have concluded that Plaintiff needed medical treatment after he was savagely and repeatedly beaten about the head, face, and body by three or

-44-

four other inmates, lost consciousness, had lacerations, bruises, and swelling about his head and face, and could neither open his mouth or eat solid foods because of jaw injuries.

168.    Upon information and belief Lt. Rollins and Officer Wills (as well as Officer Yarbrough, whose first name remains unknown) and Nurses Lawson and Cartwright all encountered Plaintiff after he was savagely beaten. Plaintiff was wearing a jail uniform splattered with blood, was incoherent due to a concussion, had lacerations, bruises, and swelling about his head, face, neck, back, and/or hip, was unable to open his mouth due to repeated blows to his jaw, barely able to speak, and was in constant and severe pain, all of which was communicated to or known by these Defendants.

169.    Lt. Rollins and Officer Wills (as well as Officer Yarbrough, whose first name remains unknown) and Nurses Lawson and Cartwright knew that the Plaintiff was suffering from a serious medical injury and that it would not get better without proper treatment.

170.    Yet, these Defendants, including the purported medical professionals, failed to provide Plaintiff with any meaningful medical care. Officer Wills first encountered the battered and bleeding Plaintiff with Officer Yarbrough. Plaintiff begged and pleaded to be taken to the hospital, as he knew something was seriously wrong with his jaw and that he had been repeatedly knocked unconscious. Wills made no effort to advocate for Plaintiff to be transported to a hospital or for EMS. Instead, Wills and Yarbrough took Plaintiff to the control room.

171.    Once in the control room, Lt. Rollins, the supervisor on duty, got the details of the beating and Plaintiff's injuries, cleaned the blood away from Plaintiff's facial injuries, and instead of transporting Plaintiff to a nearby hospital or calling EMS or the doctor on duty, Rollins contacted QCHC Nurse Lawson.

-45-

172.     Lawson "virtually" examined and evaluated Plaintiff over a *Facetime* call. Then, knowing how Plaintiff had been injured, seeing his battered head and face, having been told by Plaintiff that he had been repeatedly knocked unconscious by the severity of the blows and kicks over a lengthy period, realizing that Plaintiff had could not open his mouth due to what was undoubtedly a serious jaw-related injury, Lawson recommended ice-packs and two Tylenol. The practical effect of Lawson's "virtual examination" was tantamount to no examination and no medical treatment at all.

173.     Rollins watched it all, and appears to have said not a word, much less insist that Plaintiff, who he had actually cleaned up and spoken to, be taken to a hospital.

174.     Placed in a medical cell, Plaintiff and other inmates continued to insist that he be taken to a hospital. Rollins and other officers would have none of it, leaving Plaintiff to fend for himself without any meaningful medical treatment.

175.     The next morning, one of the two nurses named herein, likely Nurse Cartwright, examined Plaintiff in-person and determined – despite the obvious and serious injuries to his head and face and notwithstanding his having been repeatedly knocked unconscious – that he had no fractures and did not need to be taken to a hospital. She did this, as it turned out, without using any x-rays, CT scans, or other medical diagnostic tools.

176.     Each nurse was acting under the color of law, as their job was to take care of the medical needs of Cocke County's inmate population. Each saw Plaintiff's beaten, lacerated, swollen, and bruised face, saw him unable to open his mouth, and heard him try to talk with multiple jaw

-46-

fractures. They even recognized that because he could not open his mouth to eat, he needed a "soft diet" and ordered one. Still, they refused to do anything to seriously treat his condition, suggesting only "ice packs" and over-the-counter pain medicines.

177.    Upon information and belief, it is hard to believe the nurses did not take Plaintiff's condition more seriously and either direct that he be taken to the hospital or seen by EMS. But they didn't, instead, offering him – a man suffering from a concussion and multiple jaw fractures and all the pain that came with it – ice and Tylenol. Neither nurse saw fit to contact the facility's doctor on call to examine Plaintiff.

178.    A layperson would have noticed – and Plaintiff and several inmates did – that he was seriously injured. It did not take someone with a medical background to recognize that someone who had been beaten so savagely that he was repeatedly knocked unconscious and who could not open his mouth to talk was in need of serious medical attention.

179.    By not seeing to Plaintiff's serious medical needs, these Defendants allowed his condition to worsen, escalating into a condition that warranted emergency surgery and multiple tooth extractions. Although the "medical care" Plaintiff received was tantamount to no medical are at all, there is, nonetheless, verifying medical evidence that establishes the detrimental effect of the delay in medical treatment.

180.    By not having Plaintiff transported to a hospital where his injuries could have been properly diagnosed and treated, Nurse Lawson and Nurse Cartwright subjected Plaintiff to cruel and inhuman treatment, thereby violating his rights under the Eighth and/or Fourteenth Amendments. Still acting under color of law, Lt. Rollins also failed to intercede to stop these violations that the nurses were committing in his presence, though he had the power and duty to do so.

-47-

181.    The sum of the above indicate that Nurses Lawson and Cartwright were deliberately indifferent to Plaintiff's serious medical needs. They saw his condition. Told to be cost-conscious, the nurses ignored the contractual provisions that permitted the transport of inmates to a hospital.

182.    As a direct and proximate result of the foregoing acts or omissions of Lt. Rollins, Officer Wills, Nurse Lawson, and Nurse Cartwright, Plaintiff suffered serious injuries.

183.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT SIX

### POLICY, CUSTOM, AND PRACTICE OF DENYING MEDICAL CARE
### OR PROVIDING INADEQUATE MEDICAL CARE TO INMATES
### (MUNICIPAL LIABILITY)

### VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
### 42 U.S.C. §§ 1983 and 1988

### Under Fourth, Eighth, and/or Fourteenth Amendments

### (Against QCHC)

184.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

185.    For purposes of 42 U.S.C. § 1983, QCHC acted under color of state law in providing medical care to Cocke County Jail inmates, such as Plaintiff.

186.    QCHC was the contracted medical provider for inmates in the Jail at all times relevant hereto. The QCHC presence inside the jail was under-staffed, under-qualified, and ill-equipped to take competent care of a Jail chronically overcrowded. Upon information and belief, in effect on March 19, 2022 was an agreement that Cocke County had executed with QCHC in which QCHC promised to secure the transportation of inmates that its medical staff at the Jail could

-48-

not treat. Needing x-rays, CT-Scans, and immediate surgery to repairs multiple jaw fractures and impacted teeth, Plaintiff was clearly such a patient. However, QCHC's nurses at no time asked that the CCSO jail staff transport Plaintiff to a nearby emergency room.

187.    Nurses Lawson and Cartwright were employees of QCHC.

188.    QCHC, by and through its employees and agents at the Jail, personally participated in denying proper medical care to Plaintiff.

189.    With deliberate indifference to the serious medical needs of inmates, QCHC has failed to develop and implement adequate policies and procedures for the handling of inmates with serious health conditions at the Jail, with the foreseeable result that inmates such as Plaintiff would not receive appropriate treatment.

190.    QCHC has established deliberately-indifferent policies, customs, practices, or patterns concerning inmate medical care, including, but not limited to a policy, custom, practice, or pattern of delaying or denying necessary medical treatment to avoid incurring expenses for inmate medical treatment.

191.    QCHC and Cocke County were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for inmates. This plan included a policy, custom, practice, or pattern of delaying or denying necessary medical treatment by outside providers. Notably, an incident occurred at the Jail hours after Plaintiff was beaten demonstrating the double standard between inmate care and officer care. The shift log indicates that a Corrections Officer named "Sgt. Mihalek" was "poked in the leg by a fired taser

-49-

prong" and within an hour, was on her way to the hospital ER "to get checked out." Yet, Plaintiff, whose injuries were clearly more severe than a "poke" by a "fired taser prong," was not allowed to be taken to the hospital "to get checked out."

192.    QCHC was on notice that this policy, custom, practice, or pattern created a substantial risk of serious harm and indeed was harmful to the health of inmates, causing them to experience unnecessary pain and suffering.

193.    QCHC's nurses were not responsive to Plaintiff's medical needs, and repeatedly failed to secure for him necessary and appropriate medical treatment. Such actions or inactions on the part of the Nurse Lawson and Nurse Cartwright were the result of the policies, procedures, customs, and practices of QCHC.

194.    It is well known to Corrections Officers that QCHC had a practice of delaying or even denying referrals of inmates for outside medical care. Pursuant to longstanding practice, Jail medical care is largely within the discretion of QCHC personnel.

195.    QCHC failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to the denial of medical care to Plaintiff.

196.    Upon information and belief, QCHC received the Jail contract to provide medical services to inmates by touting its alleged ability to control expenses incurred for outside medical care.

197.    Pursuant to this agreement, Corrections Officers are trained to defer to QCHC staff regarding medical matters.  Co are trained to contact the QCHC nurse, even if he or she is merely an LPN.

-50-

198.    Upon information and belief, the agreement also requires QCHC to provide substantial insurance coverage, to name the County and Sheriff as additional insureds, and to indemnify the Sheriff, the County, and their agents and employees in connection with any claim related to healthcare services. Under the contract, as long as Corrections Officers defer to QCHC medical personnel on medical decisions, they are indemnified by QCHC's insurance carrier. In other words, the contract encourages Corrections Officers to defer to QCHC personnel.

199.    Corrections Officers are expected to claim they cannot be responsible for deficient medical care by QCHC personnel. Sheriff Fontes, Chief Hartsell, and the officers they supervised, however, were well aware – based upon previous incidents – that QCHC medical providers frequently provided substandard and frequently inhumane medical care to inmates.

200.    Here, Lt. Rollins and Officers Willis and Yarbrough had the opportunity to see and talk to Plaintiff, appreciate the seriousness of the beating and his loss of consciousness, observe Plaintiff's head and facial injuries, lacerations, bruises, swelling, and that he was unable to open his mouth. Lt. Rollins also witnessed the "virtual" examination by Nurse Lawson and her recomendation of an ice pack and Tylenol and did nothing, knowing Lawson's efforts were subpar and that Plaintiff was in medical distress.

201.    QCHC's business model, as reflected in the agreement, succeeds by underbidding the competition and implementing severe cost-control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

202.    Cocke County and Sheriff Fontes were aware of QCHC's business model and that QCHC prioritized "cost-control" over inmate health and safety; yet, they hired QCHC as the lowest-bid contractor to save money, contributing to the above-described customs, patterns, or policies.

-51-

203.     The primary areas in which QCHC implemented cost control measures were staffing, medications, and referrals to outside providers.

204.     In order to control costs, QCHC – with the knowledge and consent of Cocke County – staffed the Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically necessary referrals to outside providers, including necessary medical treatment like that denied to Plaintiff.

205.     QCHC maintains an official policy of employing under-qualified licensed practice nurses ("LPNs") and certified nursing aides ("CNAs") to essentially practice medicine at the Jail in violation of their limited licensures.

206.     While the agreement gives Cocke County the authority to hold QCHC accountable regarding the costs of inmate medical care, it provides no mechanism for reporting and accountability regarding the quality of inmate medical care, and Cocke County has not made any effort to hold QCHC accountable for how it handles inmate medical care.

207.     QCHC's practices constitute an arbitrary use of government power, and demonstrate a total, intentional, deliberate, reckless, and unreasonable disregard and indifference to the value of the lives and constitutional and common law rights of inmates at the Jail, including Plaintiff, and the systematic and deliberate violations of those rights that are likely to result from the regular and systematic pursuit of such practices.

208.     QCHC did no investigation of the incident. The QCHC brass, like the County, deliberately indifferent to the faulty structures that were bound to fail Plaintiff, never punished or even reprimanded either nurse for her deliberate indifference or failure to transport Plaintiff, as the contract with Cocke County required. As an institution, QCHC thereby ratified the unconstitutional

-52-

acts and omissions of its inadequately trained and woefully underpaid nurses at the Cocke County Jail, all in violation of the Fourth, Eighth, and/or Fourteenth Amendments. As long as they could extract money from Cocke County and render minimal services in return, QCHC owners and managers were satisfied. The human consequences of their business model mattered nothing to them.

209.    Therefore, QCHC is liable under the Fourth, Eighth, and/or Fourteenth Amendments. Its official pattern and practices, along with its custom of ignoring and deliberately minimizing the serious and known medical conditions of inmates, produced this incident, wherein its nurses denied medical care to a seriously injured inmate and inflicted cruel and unusual punishment upon him.

210.    As a direct and proximate result of the foregoing acts or omissions of QCHC, Plaintiff's constitutional rights were violated and he suffered serious injuries.

211.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT SEVEN

## FAILURE TO TRAIN AND SUPERVISE FACILITY MEDICAL STAFF

## VIOLATION OF CIVIL RIGHTS UNDER COLOR OF LAW
## 42 U.S.C. §§ 1983 and 1988

### Under Fourth, Eighth, and/or Fourteenth Amendments
### (Against QCHC)

212.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

-53-

213.    QCHC through its own policies and procedures, has failed to adequately train and supervise its employees, officers and agents (medical personnel or otherwise) to provide detainees and inmates adequate medical care for serious medical needs.

214.    Specifically, but for QCHC's improper policies and procedures, it is hard to believe how: (a) Plaintiff was permitted to suffer for approximately thirty-six (36) hours with serious head and facial trauma, including a concussion, multiple jaw fractures, and multiple impacted teeth; (b) QCHC medical staff failed to secure an x-ray, CT scan, or other diagnostic tool to determine the extent of Plaintiff's jaw injuries; (c) QCHC nurses failed to contact the doctor on call to secure his medical opinion concerning Plaintiff's head and facial injuries; and (d) QCHC medical staff failed to provide Plaintiff with any meaningful medical care, other than recommending an ice pack and over-the-counter pain medicine.

215.    QCHC's failure to train its nurses resulted in Plaintiff's inadequate medical care.

216.    Nurses Lawson and Cartwright were contracted to work for QCHC. At the time of their conduct relative to Plaintiff, both were acting within the scope of their employment. QCHC was responsible for hiring, training and supervising the Jail medical staff, including Nurses Lawson and Cartwright and was negligent in hiring, training and supervising these nurses. Such negligence was a proximate cause of Plaintiff's injuries.

217.    QCHC and Nurses Lawson and Cartwright, with knowledge of Plaintiff's serious and obvious medical needs and with deliberate indifference to such needs, acted or failed to act in such a way as to deprive Plaintiff of adequate medical care, causing him to suffer injury. Such acts and omissions violated Plaintiff's rights, as secured by the Fourth, Eighth, and/or Fourteenth Amendments.

-54-

218. QCHC supervisors had a constitutional duty to establish and implement policies, practices and procedures designed to assure that Plaintiff and other inmates received adequate medical care.

219. QCHC supervisors either failed to establish appropriate training and policies designed to assure that Plaintiff and other inmates were appropriately treated for their injuries, or alternatively, failed to enforce such training and policies.

220. QCHC supervisors permitted, encouraged, tolerated and/or knowingly acquiesced to an official pattern, policy or practice violating the constitutional rights of inmates. The actions of QCHC and its nurses were unjustified, unreasonable, and unconstitutional, and constituted a violation of Plaintiff's clearly established rights guaranteed by the Fourth, Eighth, and/or Fourteenth Amendments.

221. Even after QCHC nurses knew that Plaintiff could not open his mouth to eat or talk, neither Nurse Lawson nor Nurse Cartwright summoned for a EMS or other transport to a nearby emergency room. Nor did they call the doctor on call. Why? They were under orders to economize. The nurses were poorly trained, there were an insufficient number of them relative to the jail population, turnover was high, and morale was low. In that respect, QCHC staffers tracked Cocke County corrections officers. Like the County, QCHC's policies and practices were a moving force behind the violation of Plaintiff's constitutional right and suffering.

222. The contract for medical services between Cocke County and QCHC, in force on March 19, 2022, required QCHC to coordinate with Cocke County in training the jail staff to recognize and treat inmate healthcare needs. Neither Cocke County nor QCHC took concrete steps in furtherance of that objective, despite multiple custodial deaths between 2010 and 2022. They

-55-

knew of these custodial deaths and also knew that the jail had failed every inspection conducted by the TCI since at least 2017.

223.    The contract for medical services between Cocke County and QCHC, in force on March 19, 2022, required QCHC to coordinate with Cocke County in training the jail staff to recognize and treat inmate healthcare needs. Neither institutional Defendant took concrete steps in furtherance of that objective, despite multiple custodial deaths between 2010 and 2022. They knew of these custodial deaths and also knew that the jail had failed every inspection conducted by the TCI since at least 2017.

224.    On March 19, 2022, this deliberate indifference to adequate training and the provision of medical services set the stage for denying Plaintiff medical care. Defendants refused to transport Plaintiff to a hospital. None of the officers or nurses took any action to obtain medical transport for Plaintiff. As he bled and suffered, no affirmative expedient was forthcoming, such as a trip to the hospital, for which Plaintiff begged.

225.    As a direct and proximate result of the foregoing acts or omissions of QCHC, Plaintiff's constitutional rights were violated and he suffered serious injuries.

226.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT EIGHT

### NEGLIGENCE OR GROSS NEGLIGENCE
**(Against Cocke County and All Cocke County Individual Defendants, Individually)**

227.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

-56-

228.     The Cocke County Defendants owed a duty to Plaintiff to use due care in fulfilling their duties and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted law enforcement standards. Defendants had a duty to Plaintiff to act with ordinary care and prudence so as not to cause him harm or injury.

229.     The County has a statutory and constitutional duty to maintain the Jail to secure the safe custody, health, and comfort of inmates housed therein. Tenn. Code Ann. §§ 5-7-104 and 106. Sheriff Fontes and Chief Hartsell were also obligated by law – and had the requisite authority –  to protect persons confined to the Jail.

230.     The County is legally liable for the non-negligent acts or failures to act of County deputies under Tenn. Code Ann. § 8-8-302, including instances of gross negligence. It is also liable for the negligence of persons it employs, including Sheriff Fontes, Chief Hartsell, Lt. Rollins, and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills, Individually, and any other employee at the Jail under Tenn. Code Ann. § 29-20-205.

231.     Former Sheriff Fontes was responsible for the acts and omissions of corrections officers, including their performance or failure to perform the tasks and duties that he was statutorily obligated to perform. *See* Tenn. Code Ann. § 41-4-101.

232.     As described above, the Cocke County Defendants breached their duties of due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

### *The County, Sheriff Fontes, and Chief Hartsell*

233.     The County, Sheriff Fontes, and Chief Hartsell were on notice that chronic overcrowding at the Jail and Jail Annex and understaffing prevented inmates from being properly

-57-

classified and housed according to their potential dangerousness. Yet, they made no changes to Jail policies to require that dangerous inmates be segregated from non-violent inmates.

234.     Nor did they have a policy that would prevent violent inmates from being housed with non- or less-violent inmates.

235.     As a result of the failure to reduce overcrowded, understaffed, and unsafe conditions, Plaintiff and other inmates were put in jeopardy by being housed with violent inmates who, on information and belief, are known to be violent inmates.

### Officer Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills

236.     For their part, Lt. Rollins and Officer Raines were responsible for classifying Plaintiff while he was in the custody of the Jail. They failed to correctly classify or segregate Plaintiff as a "minimum" custody level inmate, ignoring Plaintiff's actual criminal history, the criminal histories of Plaintiff's assailants (convicted violent felons with whom Plaintiff would share a cell), and misapplying or disregarding purported factors for classification purposes.

237.     On information and belief, Lt. Rollins and Officer Raines knew that placing Plaintiff – who was in custody on misdemeanor drug charges – in a cell with violent convicted felons would pose a substantial risk that Plaintiff would be assaulted. Despite this, they assigned Plaintiff to a grossly overcrowded cell filled with a collection of violent offenders.

238.     Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills were grossly derelict in their official duties by leaving dozens of inmates in the Jail Annex largely unsupervised and unattended immediately prior to and during thre prolonged assault on the Plaintiff.

239.     These Officers were nowhere to be found when Plaintiff was being savagely beaten and kicked by inmates in his cell, dragged to the shower and beaten and kicked again, and dragged

-58-

back to his cell and beaten and kicked yet a again. The incident lasted roughly thirty to forty-five minutes.

240.    The officers failed to perform required and regular security checks that would have ultimately led them to Plaintiff's cell. Instead, the officers apparently logged that they had checked the cells when they had not, to make it appear they had done so.

241.    As a direct and proximate result of the conduct of the County, Sheriff Fontes, Chief Hartsell, Lt. Rollins and Officers Stump, Norton, Ball, Raines, Rutkiewicz, and Wills, as alleged above, and other undiscovered negligent conduct, Plaintiff was caused to suffer serious bodily injuries and severe pain and suffering, entitling him to recover compensatory damages for such damages.

## COUNT NINE

### INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS
### (Against All Individual Defendants)

242.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-99, as if fully set forth herein.

243.    The actions alleged above in Paragraph Nos. 1-99 against the Individual Defendants were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

244.    The Individual Defendants' conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish on Plaintiff. The Individual Defendants knew, or should have known, that their conduct would result in serious injuries and severe emotional distress to Plaintiff, and their conduct was perpetrated to so inflict such injury.

-59-

245.     Plaintiff has suffered nightmares, severe headaches, stress and anxiety, unwanted memories of the trauma, depression, irritability, hyper-vigilance, loss of sleep, fear of sleep, difficulty concentrating, and lives his life in fear of being assaulted.

246.     As described in detail in Paragraph Nos. 1-99, the acts of the Defendants were willful, oppressive, intentional and malicious; therefore, punitive damages should be assessed against them in an amount deemed sufficient to punish and deter them and others in similar positions of authority from engaging in similar conduct in the future.

## VII.   JURY DEMAND

247.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.     That Defendants be served with a copy of this Complaint and be required to answer;

B.     That the Court find that Defendants have engaged in the unconstitutional conduct and statutory and common law violations alleged herein;

C.     That Plaintiff recover compensatory damages in the sum of $500,000, as provided by federal and Tennessee law, jointly and severally, and that a judgment in his favor be entered against the Defendants in an appropriate amount as shown at trial;

D.     That alternatively, Plaintiff be awarded such damages as will fully compensate him for all injuries proximately caused by Defendants' actions and that a judgment in his favor be entered;

-60-

E.      That Plaintiff be awarded punitive damages in the sum of $1,000,000, or an appropriate amount sufficient to deter Defendants from engaging in similar conduct in the future;

F.      That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.      That Plaintiff be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 20th day of March, 2023.


/s/ Lance K. Baker
Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

*Counsel for Plaintiff*

-61-